**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**


**TINA L. MOORE,**

       **Plaintiff,**

**vs.**                              **Case No. 1:09cv193-MP/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

       **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Tina L. Moore, applied for disability insurance benefits.  Her last date of insured status for disability benefits was March 31, 2007, and her age on that date was 39 years.  Plaintiff alleges disability due to anxiety, obsessive compulsive disorder, and depression, with onset on August 1, 2001.  Plaintiff has two years of college and has

past relevant work as a newspaper reporter and a publisher. The Administrative Law

Judge found that Plaintiff has the residual functional capacity to do a full range of

unskilled light work. Relying upon the "grids,"[1] a finding of not disabled was made.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles. Chester

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a

scintilla, but less than a preponderance. It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion." Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if

supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002). "If the Commissioner's decision is supported by substantial evidence we must

affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial

deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to

uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ. A reviewing court must view the entire record and take account of

evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber

v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed

---

[1] Appendix 2 to Subpart P of Part 404 – Medical-Vocational Guidelines, found at:
http://www.ssa.gov/OP_Home/cfr20/404/404-ap11.htm

all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1.  Is the individual currently engaged in substantial gainful activity?

2.  Does the individual have any severe impairments?

3.  Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.  Does the individual have any impairments which prevent past relevant work?

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Medical evidence**[2]

     Plaintiff was seen on August 22, 2003 by Dr. Jeffrey Tate[3] for psychiatric care.

R. 113.  She was found to have a mildly blunted affect, depressed mood, and was

obese.  Dr. Tate noted that Plaintiff had gained 100 pounds in the past five years, and

had "lots of nocturnal worry."  R. 112.  She told Dr. Tate that she woke up in a near

panic, had increased anxiety, and was emotionally out of control.  _Id._  Some increase in

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS' DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS, found at www.nlm.nih.gov/medlineplus/mplusdictionary.htm.

[3] The provider's name is not legible in the records, but Plaintiff represents that this was the name of the provider.  Whether this was a Ph.D. psychologist or an M.D. psychiatrist is unknown.

depression was noted. *Id.* One of the diagnoses was recurrent severe major depression without psychosis.[4] *Id.* Lexapro[5] and Klonopin[6] were prescribed. *Id.*

On October 2, 2003, Dr. Tate noted no abnormalities except obesity. R. 111. He found that Plaintiff had a bright affect, but still had lots of nocturnal anxiety. R. 110. The partial diagnosis was major depression, recurrent, in partial remission. *Id.* He continued Lexapro and started Plaintiff on "Traz" (Trazodone).[7] *Id.*

On December 2, 2003, Dr. Tate found that Plaintiff was sleeping well, and that Lexapro had helped with depression. R. 109. Plaintiff was experiencing increased dysphoria.[8] *Id.* Lexapro and Klonopin were prescribed. *Id.* The diagnosis was severe recurrent major depression without psychosis. *Id.*

On September 23, 2004, Plaintiff was seen by Gordon McAfee, M.D., a psychiatrist, and Eugene Wunder, M.A., a licensed psychologist, for an initial mental status assessment. R. 130-138. She was then 37 years old. R. 130. She was married and had a 13 year old daughter. *Id.* Plaintiff was found to be cooperative and supplied

---

[4] The document indicates that diagnosis code 296.3 is recurrent major depression, and the addition of another "3" indicates severe without psychosis. R. 112.

[5] Lexapro is prescribed for major depression a persistently low mood that interferes with daily functioning. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[6] Klonopin is used alone or along with other medications to treat convulsive disorders such as epilepsy. It is also prescribed for panic disorder, that is, unexpected attacks of overwhelming panic accompanied by fear of recurrence. Klonopin belongs to a class of drugs known as benzodiazepines. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[7] Trazodone hydrochloride, sold as Desyrel, is an antidepressant. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[8] Dysphoria is a state of feeling unwell or unhappy. MEDLINE PLUS (MERRIAM-WEBSTER).

information to the best of her ability.  R. 130-131.  Plaintiff denied having any

involvement with the judicial system in the past.  R. 131.  Plaintiff had voluntarily sought

treatment because she had previously had treatment and said that she would "like to be

able to be a fully functioning, independent individual again . . . ."  R. 131.  Plaintiff said

she did not think she was a good candidate to attend the psychosocial rehabilitation

program due to panic attacks and "perhaps some social phobia."  *Id.*  Plaintiff said that

she had had depression for many years, and was initially medicated with Prozac.  *Id.*

Her symptoms had increased, and she no longer could afford to pay for the medication

or to attend counseling after she stopped working in August, 2001.  R. 132.  She was

switched to Lexapro.  *Id.*  She said that Lexapro made her feel "wonderful," "but she

also described behaviors which would be considered hypomanic or manic

symptomatology."  *Id.*  She said she had become more fearful of people judging her

negatively, and she preferred isolation.  *Id.*  She said that when she is near people,

such as in a grocery store, she becomes extremely panicky, has difficulty breathing,

sweats, and her heart races.  *Id.*  Plaintiff also said that she had wild mood swings.  *Id.*

She described many symptoms of a both a manic state and depression.  *Id.*  She

described a number of obsessive-compulsive behaviors as well.  R. 133.  Plaintiff said

that she had suicidal thoughts, and was self-abusive, hitting her head with her fist, shoe,

or into the wall.  R. 135.  Plaintiff said that she does all of the shopping for groceries, but

feels very panicky when she does so and has an impulse to escape from the store.  *Id.*

She does all of the household chores, and feels that she does so compulsively.  *Id.*  She

said she was active in an animal rescue movement, and others in that activity were

supportive of one another.  R. 136.  She had two years of college, had worked with her

husband running a newspaper in Wheaton, Missouri, and would very much like to be

productively working again.  *Id.*  She said she is no longer able to attend her daughter's

school functions due to social phobias, and could no longer engage in other activities in

public.  *Id.*  Plaintiff was very interested in having a "CSW" (clinical social worker), but

did not feel she was a good candidate for another program due to panic attacks and

discomfort when around other people.  R. 137.  She was diagnosed with severe bipolar

disorder (most recent episode mixed, without psychotic features, without full inter-

episode recovery), panic disorder with agoraphobia, and obsessive compulsive

disorder.  R. 134.  She was assigned a current Global Assessment of Functioning

(GAF)[9] score of 53.[10]  *Id.*

　　　Plaintiff saw Dr. McAfee on October 6, 2004.  R. 135.  Dr. McAfee's impression

was that Plaintiff was bipolar, had obsessive-compulsive disorder, and during the

depressed phase was also agoraphobic.  *Id.*  She started Plaintiff on Lithium.  *Id.*

　　　Plaintiff returned to Dr. McAfee on October 20, 2004.  R. 144.  She said that

Lithium made her moods better, but she had developed an upset stomach and diarrhea.

*Id.*  Dr. McAfee reduced the dosage of Lithium.  *Id.*

─────────────────────

[9] "The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.'  *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)."  <u>Sims v. Barnhart</u>, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).

[10] "GAF scores of 51-60 indicate '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).' "  <u>Hudson ex rel. Jones v. Barnhart</u>, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).

On November 3, 2004, Dr. McAfee determined that Plaintiff was intolerant of Lithium. R. 143. She reported that she "got wild and crazy – beating her head against the wall, and tearing up things, and we reduced her Lithium and she did not do well with that." *Id.* Dr. McAfee discussed other possible medications, and said: "We pretty clearly think she is bipolar." *Id.* He gave her samples of Seroquel,[11] noting that Plaintiff could not afford to buy that drug.

On November 17, 2004, Dr. McAfee reduced the dosage of Seroquel. R. 142. On December 8, 2004, Plaintiff reported to Dr. McAfee that she was quite moody on Seroquel. R. 141. Dr. McAfee switched her to samples of Depakote,[12] but again noted that "[t]his lady does not have any financial support for her medications." *Id.*

On December 22, 2004, Plaintiff told Dr. McAfee that she thought that "we are on the right track, that the Depakote has done good things for her. She has not had the up and down." R. 140.

On January 19, 2005, Dr. McAfee noted that this would be the last time that he would see Plaintiff because Plaintiff was moving from Missouri to Florida. R. 139. Plaintiff said that she was "hyper." *Id.* She recognized that she was not sleeping, and that she was in "hummingbird mode and wished she could stay there but also is aware that she does not." *Id.* She was still doing relatively well on Depakote and it was

---

[11] Seroquel is prescribed for the treatment of schizophrenia. It is also used for the treatment of manic and depressive episodes associated with bipolar disorder. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[12] Depakote is used for manic episodes associated with bipolar disorder, epilepsy, and migraine headaches. PHYSICIANS' DESK REFERENCE (2005).

recommended that she continue to take it.  *Id.*  Dr. McAfee discharged her with a diagnosis of bipolar disorder.  *Id.*

On April 10, 2005, an involuntary commitment for mental health treatment was initiated by a Florida deputy sheriff (pursuant to Florida's Baker Act)[13] and Plaintiff was evaluated at Meridian Behavioral Healthcare, Inc.  R. 188-189.  Plaintiff had threatened to commit suicide using her husband's medications.  R. 188.  She had been taking Depakote until a few weeks earlier, and apparently had been unmedicated for a few weeks.  *Id.*  She advised that she and her husband were experiencing stress from the move to Florida, and she was feeling irritable, depressed, and had racing thoughts.  *Id.*  She was found to be not in acute distress, was well-groomed, had normal speech, but had depressed mood and euphoric affect.  *Id.*  She denied suicidal thoughts.  *Id.*  The diagnosis was bipolar disorder, NOS.  R. 189.  A current GAF of 40 was assigned.[14]  *Id.*  Depakote, Ativan, and Wellbutrin were prescribed.  *Id.*

On September 1, 2005, Plaintiff was evaluated at Meridian by Gayle Davis, MSSW-Counselor IV.  R. 190-199.  Plaintiff said that she had been feeling better but had financial and family stressors.  *Id.*  She talked rapidly and said that she had fears in public.  R. 191.  She said that she had problems with racing thoughts.  R. 192.  Her

---

[13] Since there is no court order in this record, it is probable that the process was initiated by law enforcement and that Plaintiff then voluntarily submitted herself for evaluation and treatment, thus rendering moot the need for a court order.

[14] A GAF score of 31-40 indicates: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant ) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ( e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school )."  *See*  http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

cognitive functions were found to be intact except for concentration.  *Id.*  Her mood was found to be under control due to medication.  R. 193.  It was noted that her medication had worked well.  R. 195.  Plaintiff said she preferred to remain in her home.  R. 198. She was assigned diagnoses of bipolar disorder, obsessive-compulsive disorder, and posttraumatic stress disorder (from domestic violence she witnessed at her home when she was a child).  R. 199.  She was assigned a current GAF of 52, with 65 as the highest in the past year.  *Id.*

On September 15, 2005, Plaintiff was seen by Rhonda Martin, M.D., a psychiatrist at Meridian.  R. 180-181.  Plaintiff said that she was doing "really well," though her sleep was poor.  R. 181.  Her appetite was good.  *Id.*  Her mood was found by Dr. Martin to be "okay" and her affect was appropriate.  *Id.*  Dr. Martin said that Plaintiff was feeling okay on her current medications.  *Id.*  Anxiety disorder was added to the list of ailments, with a note to rule out PTSD and bipolar disorder, and the medications were continued.  *Id.*

On September 29, 2005, Plaintiff again saw Dr. Martin.  R. 178.  Plaintiff reported that she had a "metallic taste in her mouth" and was shaking.  R. 179.  Dr. Martin noted that she had reduced the level of Depakote and Plaintiff had felt better.  *Id.*  She had begun again to have thoughts of suicide and reported that she had had a "breakdown last week."  *Id.*  Her husband had been very ill.  *Id.*  Plaintiff reported feelings of mild paranoia, and Dr. Martin thought that her judgment and insight were only fair.  *Id.*  Still, Plaintiff thought that she was doing better overall.  *Id.*  Dr. Martin discontinued one

medication, continued Klonopin, and increased Depakote.  *Id.*  The diagnosis was MDD

(major depressive disorder), rule out PTSD and bipolar disorder.  *Id.*

On the same date, September 29, 2005, Dr. Martin filled out a mental status

evaluation.  R. 153-159.  Dr. Martin's diagnosis was major depression disorder.  *Id.*  She

assigned a current GAF of 45, with 60 as the highest in the past year.  *Id.*  Dr. Martin

noted the following clinical findings as supportive of her opinion:  poor memory, appetite

and sleep disturbance, personality change, mood disturbance, emotional lability,

recurrent panic attacks, paranoia, feelings of guilt, difficulty concentrating, suicidal

ideation, oddities of thought, illogical thought, social withdrawal, obsessions, intrusive

recollections, hostility, anxiety, and hand tremor.  R. 153A.  Dr. Martin noted that there

were no laboratory or diagnostic test results to support these findings.  *Id.*  She said that

Plaintiff's primary symptoms were anxiety, insomnia, depression, hopelessness, and

occasional thoughts of suicide.  R. 154.  Dr. Martin thought that Plaintiff was moderately

limited (defined as significantly affected but not totally precluded) in her ability to

understand, remember, and carry out detailed instructions, to maintain attention and

concentration for extended periods, to make simple work related decisions, to complete

a normal workweek without psychological interruptions, to request assistance, and to

set realistic goals.  R. 154-157.  She did not find, however, that Plaintiff experiences

episodes of deterioration at work to cause her to withdraw from the situation or to

exacerbate her symptoms.  R. 157.  Dr. Martin said that Plaintiff experiences sedation

from Depakote and tremors from Wellbutrin.  *Id.*  She said that Plaintiff is not a

malingerer.  R. 158.  Dr. Martin concluded that Plaintiff is incapable of tolerating even

low stress in a job.  *Id.*  She said that Plaintiff "has many stressors at home that would be compounded by entering the work force at this time," and that she had good and bad days.  *Id.*  Dr. Martin thought that Plaintiff's impairments would cause her to be absent from work more than three times a month.  R. 159.

On October 20, 2005, Plaintiff again saw Dr. Martin.  R. 176.  Her sleep and appetite were good.  R. 177.  Plaintiff reported that she had anxiety in public places, but was doing better on increased Wellbutrin and was "much improved."  *Id.*

On December 15, 2005, Plaintiff was again seen by Dr. Martin.  R. 270.  She was "not doing well" and felt as though things were "going down hill."  R. 271.  Plaintiff was anxious about having to attend her disability hearing.  *Id.*  Dr. Martin noted that Plaintiff was anxious, but her affect was congruent and her thought processes were linear.  *Id.*

The first administrative hearing began on January 9, 2006.  R. 351.  Plaintiff did not attend.  *Id.*  Her attorney said that she had told him that she could not leave home due to panic attacks and depression.  R. 351-354.  Her letter was read into the record.  *Id.*  She said that appearing at a hearing, "before a group of people who wish to judge me, who would be centering all of their attention on me would definitely put me into an anxiety attack, perhaps even back in the mental hospital."  R. 352

On February 2, 2006, Plaintiff saw Dr. Martin.  R. 268.  She was in the process of moving and was very stressed.  R. 269.  The same findings as from the last visit were noted.  *Id.*

On March 30, 2006, Plaintiff was seen by ARNP Stowell. R. 266. She had lost her medicaid benefits, but wished to continue treatment and said she would pay. R. 267. She had a stable mood, constricted affect, and her insight was only fair. *Id.*

On March 31, 2006, Plaintiff was examined on a consultative basis by Nina Barnes, Ph.D. R. 203. It does not appear that Dr. Barnes had any medical records to review as she did not mention any. Plaintiff told Dr. Barnes that her anxiety causes her to stay at home "for months at a time" and not interact with others. R. 204. Plaintiff related that she had received mental health treatment for many years, and had taken numerous psychotropic drugs, but could not recall the specific dates. *Id.* She said she had been treated at Meridian for the past year. *Id.* She said that the medications had helped, and her home life had improved, that she had experienced "no rages." *Id.* Plaintiff told Dr. Barnes that she home-schooled her 14 year old daughter, took care of her "animals," which included five dogs, lots of cats, a ferret, and a bird. *Id.* Plaintiff said that she does household chores, cooks, pays bills, and goes shopping once a week. *Id.* She also took her daughter to Meridian for help with emotional problems. *Id.* Dr. Barnes noted that Plaintiff's ability to concentrate did not seem to be impaired, and that her claimed disability was an inability to be around other people. R. 205.

Plaintiff told Dr. Barnes that she attended some college and most of her working life had been working for newspapers. R. 205. Her last job was running a weekly newspaper in Wheaton, Missouri. *Id.* She and her husband sold the business because she had become unable to meet with customers. *Id.* She said that her husband is an alcoholic, is schizophrenic, and is on disability. *Id.* During the interview, Dr. Barnes

found that Plaintiff's speech was normal, her thought processes were logical and organized, and she was only a bit nervous during the interview. R. 205-206. Her attention and memory were grossly intact, and her judgment and insight were good. R. 206.

Dr. Barnes administered the MMPI-2. R. 2006. Dr. Barnes determined that the results were invalid and a "fake bad" profile was indicated. *Id.* She said that while Plaintiff talked about having various impairments, including anxiety, panic, depression, obsessive-compulsive disorder, and bipolar disorder, she did not appear to be "the least bit nervous around" Dr. Barnes, and did not appear to have a problem with taking the MMPI-2, working at a steady pace. *Id.* Dr. Barnes noted that Plaintiff related how she took her daughter to the mental health clinic and did not mention having any sort of anxiety or panic while doing so. *Id.* Dr. Barnes concluded: "[T]his claimant is very capable of claiming conditions and reporting experiences that will enhance her application for disability but bear little relation to reality." *Id.* Dr. Barnes's diagnosis was malingering. *Id.* Dr. Barnes said that based upon her interview and the results of the MMPI-2, it did not appear that Plaintiff "would have any mental difficulties performing work related activities." *Id.*

On May 10, 2006, Plaintiff was seen by Bilal M. Khodr, M.D., at Pediatric and Family Medicine in Perry, Florida. R. 262. She said that she was having significant problems with depression and anxiety. *Id.* She said she could not see the psychiatrist because she was running out of money, and wanted a refill of her medications. *Id.* Dr. Khodr refilled her prescriptions for Wellbutrin, Xanax, and Depakote. *Id.*

Plaintiff was to appear for her second administrative hearing on September 5, 2006. R. 255. She again wrote a letter explaining why she could not attend. R. 256. In the course of that explanation, Plaintiff stated that in 1989, having never broken the law before, she tried to hire a "hitman" to blow up an apartment building filled with people because three people in the building "were being mean to a man I loved." R. 256. She said she was not on medication at that time, and the "hitman" was an undercover officer. *Id.* She was sentenced to prison. *Id.* She said in the letter that she had been on and off medication for years. *Id.* She explained that in 1994, she purchased a small town newspaper, but by 1999, had to sell the business because she could no longer deal with the public. R. 257.

On September 27, 2006, Plaintiff was seen by Anjali A. Pathak, M.D., a psychiatrist, for a psychiatric evaluation in connection with her disability claim. R. 316. She had been referred to Dr. Pathak by her lawyer. *Id.* Plaintiff's description of her symptoms included fear of panic attacks if she were to leave her home, violent temper, banging her head against the wall, dislike of people, dislike of physical contact with people, and obsessively checking that the stove is off or that the doors are locked. *Id.*

Dr. Pathak said that she had limited medical records to review. R. 316. She reviewed those records, covering the period 2003 to 2006, the same records reviewed above. R. 316-318. Plaintiff was then taking Depakote, Wellbutrin, and Klonopin, but had not taken any medication in the prior two weeks because she ran out. R. 318. On examination, Dr. Pathak found Plaintiff's eye contact to be fair and her speech to be normal. R. 319. Plaintiff said that she had a panic attack coming into the office, but Dr.

Pathak said that Plaintiff "appears calm and her affect is appropriate." *Id.* Plaintiff said that she feels sad and angry a lot of the time, feels anxious, and has low energy. *Id.* She said her concentration "is not as good as it used to be." *Id.*

Dr. Pathak used a screening tool to check for depression. R. 320. Plaintiff rated 26 out of 27 points, and Dr. Pathak concluded that Plaintiff is currently severely depressed. *Id.* Plaintiff endorsed 12 out of 13 items on the bipolar disorder screening tool, and this was interpreted by Dr. Pathak as positive for bipolar disorder. *Id.*

Dr. Pathak administered the MMPI-2. R. 320. She noted that Plaintiff scored 95, 105, and 81 on three validity scales, and that scores above 80 "are usually indicative of exaggeration." *Id.* Dr. Pathak said:

> Tina Moore's extremely elevated F scores and relatively low VRIN score suggest that her endorsement of extreme items is a result of careful item responding rather than an inconsistent response pattern. She apparently understood the item content and considers the symptoms descriptive of her functioning. Her self-description as extremely disturbed requires further consideration because she claims many more psychological symptoms than most patients do. Two likely possibilities require further evaluation. It is possible that she is exaggerating her symptoms in order to gain attention or services. Sometimes an individual involved in litigation will produce this exaggerated clinical scale profile. If an exaggerated response set can be ruled out based on life circumstances, it may be that her extreme responding resulted from unusually severe psychological problems. This MMPI-2 should be interpreted with caution. There is some possibility that the clinical report is an exaggerated picture of the client's present situation and problems. This response set could possibly result from poor reading ability, confusion, disorientation, stress or need to seek a great deal of attention for her problems.

R. 320. Dr. Pathak later said that Plaintiff's response to "items in the latter portion of the MMPI-2 were somewhat exaggerated in comparison to her responses to earlier items."

*Id.* It was noted that Plaintiff had "significant elevations on scales 2, 4, 7, 8, and 0 with T-scores of 86, 81, 86, 94, and 80 respectively." R. 321.

Dr. Pathak then said that Plaintiff's MMPI-2 clinical profile involves "chronic psychological maladjustment." R. 321. She said that Plaintiff was overwhelmed with anxiety, tension, and depression, feels helpless and alone, and believes her life is hopeless. *Id.* She said that Plaintiff tries to control her life with unproductive self-analysis, "but has difficulty concentrating and making decisions." *Id.* Dr. Pathak said: "This is a rather chronic behavioral pattern. Individuals with this profile live [a] disorganized and pervasively unhappy existence." *Id.* Dr. Pathak said that Plaintiff "seems to lack basic social skills and is behaviorally withdrawn. She may relate to others ambivalently, never fully trusting or loving anyone." R. 322. Dr. Pathak said that Plaintiff is "highly introverted and [an] interpersonally avoidant person . . . ." *Id.* She diagnosed Plaintiff with bipolar disorder 1, and obsessive compulsive disorder, and with schizoid personality disorder. *Id.* She assigned a current GAF score of 60-65 with a past GAF score of 75.[15]

Dr. Pathak strongly recommended that Plaintiff have treatment with a psychiatrist to manage her medications. R. 324. She said that Plaintiff may be resistant to treatment, but "she is in need of a great deal of emotional support at this time." R. 325. She said that individuals with Plaintiff's profile "tend to be overideational and given to

---

[15] A GAF score of 61-70 indicates: "Some mild symptoms ( e.g., depressed mood and mild insomnia ) OR some difficulty in social occupational, or school functioning (e.g., occasional truancy or theft within the household ), but generally functioning pretty well, has some meaningful interpersonal relationships." *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

unproductive rumination," do not do well in insight therapy, and "may respond more to

supportive treatment of a directive, goal oriented type." *Id.* Dr. Pathak concluded:

> Subjectively the patient reports many symptoms, but in her presentation in
> the interview there was no acute distress. Therefore, I also recommend
> vocational rehabilitation for this patient that should focus on finding a low
> stress occupation with minimal public contact once psychiatric symptoms
> are under control. Perhaps part time initially and increase hours as the
> patient tolerates. Since Ms. Moore is currently experiencing psychiatric
> symptoms, she is currently unable to work.

R. 325.

Dr. Pathak filled out an impairment questionnaire. R. 326. She said that Plaintiff

was markedly limited (defined as effectively precluding ability to perform the activity in a

meaningful way) in her ability to understand, remember, and carry out detailed

instructions, to perform and to be punctual within a schedule, to interact appropriately

with the general public, to respond appropriately to changes in a work setting, and to

travel to unfamiliar places or use public transportation. R. 329-331. She said that these

limitations were caused by anxiety leading to social withdrawal. R. 331. Dr. Pathak

said that it was to be expected that these impairments would last at least twelve

months, but it was uncertain whether Plaintiff was a malingerer. R. 332. Dr. Pathak

said that Plaintiff showed up for the interview, was not labile in mood, and cooperated

with testing, and thus was capable of tolerating low stress. *Id.* She thought that Plaintiff

would be absent from work two to three times a month due to her impairments. R. 333.

As noted above, the second administrative hearing was to be held on September

5, 2006. R. 365. Plaintiff again did not attend. R. 367. The ALJ's expert, Michael

Rose, M.D., a psychiatrist, was not prepared to testify, and a third hearing was held on

November 1, 2006. R. 382. While the first page of this transcript states that Plaintiff was present, there is nothing in the transcript to indicate that Plaintiff was in fact present. R. 382-410.

Dr. Rose testified by telephone. R. 382. Dr. Rose said he had reviewed this record. R. 387. Dr. Rose was asked by the ALJ whether he had formulated an opinion as to Plaintiff's mental impairments, based upon his review of the record, and instead of answering that question, Dr. Rose launched into a discussion of the finding of Dr. Barnes that Plaintiff was malingering and the evidence that Plaintiff had been charged with solicitation to commit capital murder. R. 388. Dr. Rose's opinion can be gleaned the record, however.[16] He pointed out that Plaintiff "tends to talk in terms of diagnoses," R. 391, but "there's no conclusive study anywhere of a psychiatrist making an individual evaluation, a personal evaluation that backs up [what] the patient has." R. 392. He said that Plaintiff was "a manipulative individual of a sociopathic nature who makes up symptoms," and he did not see anything to back up a diagnosis of bipolar disorder. R. 394. He discounted a diagnosis of depression because there were many reports that Plaintiff's mood was "elevated good." R. 395. Dr. Rose said that Plaintiff "tells the doctors what's going on. The doctors never really state the major impairments and limitations, and instead state the impression themselves. The patient gives the doctor evidence, but the doctors don't document that evidence in any medically consistent fashion anywhere in a report." R. 397. He said that this "is typical of an individual that

---

[16] Ultimately the ALJ determined he would not rely on the evidence from Dr. Rose. R. 35. The testimony is reported here in the interest of completeness.

manipulates the psychiatric system." *Id.* He said that there is no "really solid evidence"

documented by a psychiatrist or psychologist. R. 398. Dr. Rose said:

> But all of the reports have to do with more with repeating what she said.
> And that's typical of dictation to repeat the diagnoses again and again.
> And the mental health people were really inexperienced – a group of
> inexperienced, repeated diagnosis [sic], and given [sic] medication so on
> and so forth, because they don't know what to do in these kind of cases.

R. 398. He said: "And that – you can't give a patient a diagnosis as the evidence [sic] –

the doctors have not provided support, sufficient evidence to back up their diagnosis."

R. 399. Dr. Rose reasoned, for example, that if a patient told her doctor that she was

not sleeping well at night, that would be insufficient evidence from to enter a diagnosis

that the patient has a sleep problem. R. 400.

On January 14, 2007, a year later, Dr. Rose answered interrogatories submitted

to him by Plaintiff. R. 334-335. When asked if he was aware of any medical records

that discuss obsessive-compulsive behavior, Dr. Rose said that the records rely upon

Plaintiff's own diagnostic evaluation. *Id.* He said that there "were no independent

medical observations." *Id.* He then pointed to findings in the record that Plaintiff's

speech was clear and coherent, her thought processes were organized, and her mood

and perception were normal. *Id.* Dr. Rose said that observation of behavior by a

psychiatrist is useful, but in this case, there were no observations of obsessive rituals,

and Plaintiff's mood was normal. *Id.* He said that Plaintiff's refusal to appear for the

hearing was "irresponsible." *Id.* He said that "obsessives are almost always conforming

to legal requests." *Id.* He said that it was better to give an opinion after his own

psychiatric evaluation, but said that "this pt. attempted to murder several individuals in

order to commit homicide on one person.  She went to prison.  She stated [elsewhere] she has had no involvement with the judicial system."  R. 335.  He said there is sufficient evidence in the record to form a solid opinion.  *Id.*  Dr. Rose said he was aware that Plaintiff said that she had a sleep problem, but there were no "extensive nurses['] notes stating 'pt. up all night.' "  *Id.*

**Legal analysis**

### Whether the ALJ erred in the evaluation of the opinion of Dr. Martin, a treating physician

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir.

1992), and must be clearly articulated.  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1241 (11th Cir. 2004).  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1053 (11th Cir. 1986).

This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240-1241(11th Cir. 2004); <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").  *See also*, <u>Crawford v. Commissioner Of Social Security</u>, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

The Administrative Law Judge's discussion of the September, 2005, opinion of Dr. Martin was quite short.[17]  He noted that Dr. Martin had said that Plaintiff was not capable of performing even low stress jobs, but noted that "this was only due to the claimant's already many stressors at home."  R. 34.  The implicit assumption seems to be that the inability to tolerate work stress is due entirely to home stress, not due to mental impairment.  Plaintiff argues that this misconstrues the opinion, arguing that Plaintiff's incapacity for even low work stress was not due to stress at home, but due to

---

[17] Dr. Martin had only seen Plaintiff one time before rendering this opinion.  Neither side, however, has argued whether Dr. Martin was, nonetheless, a "treating physician" at the time of the opinion.

mental impairments.  Doc. 12, p. 14.[18]  Plaintiff is correct.  Dr. Martin did not say that

stress at home was the cause of Plaintiff's incapacity to tolerate low stress at work.

When asked to explain why Plaintiff could not tolerate even low stress at work, she

wrote: "She has many stressors at home *that would be compounded by entering the*

*work force at this time.*"  R. 158 (emphasis added).  In other words, Dr. Martin said that

Plaintiff could not tolerate low work stress because trying to work at that time would

cause stress ("entering the work force at this time") and this would compound the home

stress.

Plaintiff next argues that the ALJ did not give proper weight to the opinion of Dr.

Martin that Plaintiff was "moderately" limited in seven areas.  Doc. 12, p. 13.  The ALJ

observed that Dr. Martin had found Plaintiff to be "only" moderately limited in her ability

"to understand, remember, and carry out detailed instructions; maintain attention and

concentration; and set realistic goals."  R. 34.  It is true that the ALJ did not mention the

three moderate limitations listed at R. 156, to make simple work related decisions, to

complete a normal workweek with psychological interruptions, and to ask simple

questions and request assistance.  R. 34, 156.  But the ALJ need not repeat every bit of

evidence in the record.  This argument is not persuasive.

Plaintiff also argues: "By emphasizing that the assessed mental limitations are

'only' of a moderate nature and then failing to adopt those limitations at all, the ALJ

implies that moderate limitations are necessarily of no legal significance, that they would

---

[18] The page numbers referenced for document 12 are those assigned by the
electronic case filing system, not the original page number on the digital version.  The
numbers are off by one because the digital version has an unnumbered cover sheet.

not significantly erode the base of available work, and that they would not even require the presence of a vocational expert to determine their vocational impact." Doc. 12, p. 14. This argument would have merit were the court to conclude that the ALJ erred in failing to find that Plaintiff actually has the moderate limitations identified by Dr. Martin,[19] but that question turns upon whether the ALJ's determination that Plaintiff has *no* significant mental impairments is supported by substantial evidence in the record.

In reaching his conclusion that Plaintiff has "the mental residual functional capacity perform simple, unskilled tasks, with 1, 2, or 3 step instructions," R. 35, the ALJ made a number of important observations. He determined that Plaintiff's claim that she could not go out of her home due to panic attacks was not credible. R. 33. He noted that Dr. Pathak determined that Plaintiff did not currently meet the criteria for a diagnosis of panic disorder with agoraphobia. R. 32. He noted that there was no evidence of episodes of decompensation in work-like settings. *Id.* He noted that while Plaintiff told Dr. Pathak that she had a panic attack coming into the office, he found her to be calm and with an appropriate affect. *Id.* The ALJ further reasoned that in March, 2006, Plaintiff told Dr. Barnes that she "could go out shopping once a week and take her daughter to mental health appointments, without any reported panic attacks." R. 33. He noted that in September, 2006, when she was examined by Dr. Pathak, Plaintiff "had no difficulty attending an independent psychiatric examination, arranged by her

---

[19] Phillips v. Barnhart, 357 F.3d 1232, 1142 (11th Cir. 2004), *quoting* Francis v. Heckler, 749 F.2d 1562, 1566 (11th Cir. 1985) ("[e]xclusive reliance on the grids is not appropriate either when [the] claimant is unable to perform a full range of work at a given residual functional level or when a claimant has non-exertional impairments that significantly limit basic work skills").

attorney." *Id.* The ALJ noted that during that examination, Plaintiff appeared to have no difficulty providing "her intimate history." *Id.* He further noted that in March, 2006, Plaintiff told Dr. Barnes that she "could drive, cook, do household chores, pay the bills, home-school her teenage daughter, take her daughter to mental health counseling, and take care of numerous animals . . . ." *Id.* The ALJ noted Dr. Barnes found during her interview of Plaintiff that Plaintiff was:

> oriented, cooperative, of an average to above average intellectual level, and with a good fund of knowledge, normal unpressured speech, a normal range of affect, grossly intact attention, grossly intact immediate recall, good insight and judgment, logical and organized thought processes, and no evidence of delusions.

R. 34. Dr. Barnes noted that Plaintiff was only a little nervous during the examination. *Id.* The ALJ further reasoned that during Dr. Pathak's interview, Plaintiff was found to be in no acute distress. R. 34. Finally, the ALJ noted that in February, 2006, just a few months after rendering her opinion as to Plaintiff's ability to tolerate stress in a work setting, Dr. Martin said that although Plaintiff exhibited an anxious mood that day, she also exhibited normal speech, appropriate affect, had grossly intact cognition, had linear thought processes, fair insight and judgment, and had no suicidal ideation. R. 35.

The ALJ reviewed the evidence concerning Plaintiff's favorable experience with medications. R. 33. He noted that in December, 2004, she told Dr. McAfee that Depakote had "done good things for her." *Id.* In January, 2005, Dr. McAfee determined that Lithium and Seroquel had not worked for Plaintiff, but Depakote had. R. 34. In February, 2006, Dr. Martin said that Plaintiff was taking Klonopin, Depakote, and Wellbutrin without side effects. *Id.* In May, 2006, although Dr. Khodr found Plaintiff to

be depressed and anxious that day, he noted she was doing well on her medications.
*Id.* Further, noted the ALJ, the medical notes indicate that Plaintiff was alert and
oriented, not drowsy or unfocused, during the medical visits.[20]  *Id.*

Finally, the ALJ noted that on the two clinical tests administered to Plaintiff, there
were clinical indications of exaggeration and malingering.  R. 35.  Dr. Barnes
categorically concluded that the MMPI-2 results were invalid, and that Plaintiff claimed
conditions to enhance her application for disability that had little relation to reality.  *Id.*
The ALJ also noted that even Dr. Pathak, who found more limitations from the MMPI-2,
noted that Plaintiff appeared to be in no acute distress despite her many reported
symptoms, and likewise found from the test scores that exaggeration was present.  *Id.*

The findings and reasoning of the Administrative Law Judge are supported by
substantial evidence in the record discussed in detail above.  All of the ALJ's findings
accurately track portions of the record.  In summary, the ALJ's rejection of Dr. Martin's
opinion is supported by substantial evidence in the record.  The ALJ did not err in the
manner in which he evaluated the September, 2005, opinion of Dr. Martin.

**Whether the ALJ erred in his evaluation of the opinion of Dr. Pathak**

Plaintiff contends that the ALJ misstated the findings and opinions of Dr. Pathak.
Doc. 12, p. 15.  The Administrative Law Judge noted that Dr. Pathak found that Plaintiff
had bipolar disorder, obsessive-compulsive disorder, and schizoid personality disorder.
R. 34.  He noted that Dr. Pathak felt that Plaintiff was "presently unable to work because
she was experiencing psychiatric symptoms," which included "anxiety, with racing

---

[20] The exception is the September, 2005, note by Dr. Martin that Plaintiff was drowsy
with Depakote and had shakes with Wellbutrin.

thoughts and avoidance of social situations; mood swings, from euphoria to depression, with insomnia and poor temper control; and panic, with inability [to breathe]." *Id.* The ALJ also noted that Dr. Pathak said that "subjectively the patient (claimant) reported many symptoms, but in her presentation in the interview there was no acute distress." *Id.* This is a rather accurate short summary of Dr. Pathak's findings, and is supported by substantial evidence in the record. While the ALJ did not restate Dr. Pathak's specific mental residual functional capacity findings, the ALJ did not misstate Dr. Pathak's findings. He reported the essentials.

The ALJ then rejected Dr. Pathak's opinion because he had examined Plaintiff on only one occasion and because the issue of whether Plaintiff is "disabled" is reserved to the Commissioner. R. 34. The latter comment by the ALJ, that Dr. Pathak expressed an opinion as to an issue reserved to the Commissioner, is not persuasive. It is of course true that the determination of whether Plaintiff's impairments meet the criteria for disability benefits is reserved to the Commissioner, but surely the ALJ was not saying that Dr. Pathak's opinion was irrelevant to his decision on that issue. Further, experts routinely and properly express opinions touching upon ultimate issues. *Cf.*, FED. R. EVID. 704(a) ("Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact").[21] Moreover, Dr. Pathak's opinion was exactly the kind of opinion that is of crucial importance in a case like this. He said: "Since Ms.

---

[21] Subparagraph (b) applies to opinions as to mental state as an element of the crime.

Moore is currently experiencing psychiatric symptoms, she is currently unable to work."

R. 325. This was a psychiatric opinion, not an intrusion into the ALJ's domain.

The first reason is likewise not particularly persuasive, standing alone. Dr.

Pathak was a consultant. A consultative examination, that is, a one-time examination

by a physician who is not a treating physician, need not be given deference by the

Commissioner. McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); Kirby v. Astrue,

500 F.3d 705, 709 (8th Cir. 2007) (a consulting physician's opinion "deserves no special

weight"). The opinion of a consultative physician, however, is still a medical opinion

deserving of consideration along with all of the other evidence. If the opinion of a

consulting physician is consistent with other medical evidence, it is entitled to great

weight. Moncrief v. Astrue, 300 Fed.Appx. 879, 881 (11th Cir. Dec 01, 2008) (not

selected for publication in the Federal Reporter, No. 08-12853).

The issue of whether the opinion of Dr. Pathak was consistent with other medical

evidence, however, was resolved elsewhere in the ALJ's opinion. It was not, for the

reasons discussed above. Plaintiff's condition as observed by mental healthcare

providers during almost all of the interviews was essentially unimpaired. No one noted

any serious impairments manifested during the interviews and evaluations. Plaintiff was

doing well on her medications. The MMPI-2 was twice administered and both Dr.

Barnes and Dr. Pathak noted "false bad" scores, indicative of exaggeration and

malingering. As noted above, although Plaintiff said that she had had a panic attack

coming into Dr. Pathak's office, Dr. Pathak's did not observe anything resembling a

panic attack. Plaintiff appeared calm and had an appropriate affect, as noted by the

ALJ.  R. 31.  The ALJ also pointed out, as noted above, that Plaintiff was able to be completely candid with Dr. Pathak, and had no difficulty attending that examination.  R. 33.  He also noted that Dr. Pathak found that although Plaintiff presented many subjective symptoms, she was in no acute distress during the interview.  R. 34.  In summary, the evidence discussed by the ALJ was substantial evidence in the record to discount portions of Dr. Pathak's evaluation, those portions finding that Plaintiff's impairments precluded all forms of work.

### Whether the ALJ erred in refusing to allow Plaintiff to cross-examine Dr. Barnes

The ALJ sent the report of Dr. Barnes to Plaintiff on April 18, 2006, and advised her of her right to a supplemental hearing and to request subpoenas.  R. 211.  Plaintiff requested that the ALJ issue a subpoena to Dr. Nina Barnes so that she could be examined at the hearing.  R. 214.  The ALJ did not categorically refuse to issue the subpoena, but offered to allow interrogatories to Dr. Barnes.  R. 217.  Plaintiff again asked for a subpoena to issue, and the ALJ read this as a choice not use interrogatories.  R. 242.  The ALJ did not mention the request for a subpoena.  *Id.*

At the third hearing, the ALJ said that he was waiting for Plaintiff's attorney to explain why he could not establish the facts through interrogatories.  R. 387.  He noted that Plaintiff elected not to "avail" herself of that opportunity.  *Id.*  Implicitly, the ALJ denied issuance of a subpoena, at least until Plaintiff showed good cause why written interrogatories would have served the same purpose.  Plaintiff argues that this was error.  Doc. 12, pp. 16-18.

Plaintiff relies upon <u>Demenech v. Secretary of the Dept. of Health and Human Services</u>, 913 F.2d 882 (11th Cir. 1990). That case cited <u>Hudson v. Heckler</u>, 755 F.2d 781, 784 (11th Cir. 1985) and <u>Cowart v. Schweiker</u>, 662 F.2d 731, 737 (11th Cir. 1981) for the rule that it violates a claimant's right to procedural due process for the Secretary to deny a claimant Social Security benefits based upon post-hearing medical reports without giving the claimant an opportunity to subpoena and cross-examine the authors of such reports. 913 F.2d 884. The court held that "where the ALJ substantially relies upon a post-hearing medical report that directly contradicts the medical evidence that supports the claimant's contentions, cross-examination is of extraordinary utility." *Id.*, at 885. <u>Demenech</u> also cited <u>Wallace v. Bowen</u>, 869 F.2d 187, 192 (3d Cir. 1989). <u>Wallace</u>, <u>Hudson</u>, and <u>Cowart</u> were cases in which the ALJ received post-hearing evaluations, considered them, but did not have a supplemental hearing. <u>Wallace</u>, in particular, cited to cases finding a denial of due process where the ALJ relied upon post-hearing evidence and did not afford the claimant a reasonable opportunity to question or rebut the evidence. 869 F.2d at 190-191.

The "after the hearing" feature was important to a different result in <u>Butera v. Apfel</u>, 173 F.3d 1049 (7th Cir. 1999). In that case, the court cited <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) for the rule that it is proper to consider hearsay expert reports in Social Security hearings, since such reports are typically "routine, standard and unbiased," and the "sheer cost" of providing live medical testimony was an important consideration. 173 F.3d at 1058, quoting 402 U.S. at 406, 91 S.Ct. at 1430. The court noted that pursuant to the Administrative Procedures Act, a

claimant is entitled to "such cross-examination as may be required for a full and true disclosure of the facts." 173 F.3d at 1057, citing 5 U.S.C. § 556(d). The court further noted that a party requesting a subpoena must "state the important facts that the witness or document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena." *Id.*, quoting 20 C.F.R. §§ 404.950(d)(2), 416.1450(d)(2). The court concluded that "cross-examination is thus not an absolute right in administrative cases." *Id.* (citation omitted). The court concluded that in contrast to other cases, the medical testimony was presented at the hearing, not after the hearing. *Id.*, at 1059. The court found that the claimant had failed to show good cause for cross-examination. *Id.*

In this case, the report of Dr. Barnes was central to the ALJ's decision. But the report was submitted before the supplemental hearing. Plaintiff had a chance at the supplemental hearing to make argument concerning the report, and to present evidence. Plaintiff was also afforded the opportunity to submit written interrogatories to Dr. Barnes. Plaintiff has not demonstrated what might have been learned had Dr. Barnes been deposed or examined at the hearing. It is already established that Dr. Barnes did not review Plaintiff's medical records, so a subpoena was not needed to establish that fact. Dr. Barnes simply would have said that her opinion was based entirely upon Plaintiff's presentation during the testing and the results from the test. Plaintiff makes no specific argument as to what else might have been revealed had Dr. Barnes been subjected to cross examination. Cross examination in this instance, therefore, has not been shown to have been required for a full and true disclosure of the

facts.  It was not a due process error for the ALJ, in his discretion, to decline to issue a

subpoena and to instead offer the chance to submit interrogatories to Dr. Barnes.

**Whether the Appeals Council erred in conducting its review without pages 2 and 5 of the ALJ's decision**

Plaintiff argues that the Appeals Council did not have a copy of the complete

decision of the Administrative Law Judge because pages two and five of that decision

were missing.  The Appeals Council said it did not have pages two and five, but it

concluded that it did not need them to perform its review function.  R. 13.  The pages

were missing from this record as well when the record was filed.  See R. 29-30

(skipping page two) and R. 32-33 (skipping page five).  In compliance with my order,

doc. 19, those two pages were filed.  Doc. 20.

Page two of the decision is boiler-plate.  It lays out the regulatory framework for

decision, but has nothing specific to Plaintiff.  R. 20-1, p. 2.  Page two was not needed

for review by the Appeals Council.

Page five, however, contains substantive findings by the ALJ.  Doc. 20-1, p. 3.

First, it contain the ALJ's residual functional capacity determination.  This was not

needed for review by the Appeals Council because the same determination was

repeated on page eight of the opinion.  R. 35.  The paragraphs which follow this residual

functional capacity determination are, like the paragraphs on page two, standard boiler-

plate setting forth the way in which a claimant's description of symptoms are to be

evaluated.  Doc. 20-1, p. 3.  This likewise was not needed for Appeals Council review.

The only portion of page five that might have been useful for Appeals Council

review, that was not boiler-plate or a finding repeated elsewhere, is the continuation of

the ALJ's reasoning at step 3, that Plaintiff's "severe" impairments do not meet or equal a Listed impairment. R. 32; doc. 20-1, p. 3. Four lines are missing from that paragraph, lines which appear on the missing page five. Doc. 20-1, p. 3. Plaintiff, however, did not make any argument to the Appeals Council that the ALJ erred at step 3 as to whether Plaintiff's impairments met or equaled a Listed impairment. R. 344-348. Hence, the lack of pages two and five of the ALJ's decision could not have caused the review by the Appeals Council to have been unfair, and no useful purpose would be served to remand to the Appeals Council to make their review with those pages in the record.

**Conclusion**

This court's review is only to determine whether there is substantial evidence in the record to support the decision of the Administrative Law Judge. Certainly there is evidence in this record that mental health treating sources have thought that Plaintiff has mental health impairments and have provided significant medications for treatment. But the reasoning of the Administrative Law Judge has the support of substantial evidence. The basis for the diagnoses have been entirely provided by Plaintiff. None of the treating physicians recorded objective observations supportive of those diagnoses. Plaintiff seemed quite well when interviewed and tested. The treating physicians have repeatedly found that Plaintiff's medications, once stabilized, have greatly helped her condition. Plaintiff reported daily activities inconsistent with her claim of disability. Finally, the only objective evidence, the two MMPI-2 tests, have produced significant markers for exaggeration and malingering. It was not error for the ALJ to rely upon this evidence to reach his conclusions. Thus, considering the record as a whole, the

findings of the Administrative Law Judge were based upon substantial evidence in the record and correctly followed the law. The decision of the Commissioner to deny Plaintiff's application for benefits should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on July 23, 2010.


s/     William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**